IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,

        Plaintiff,

v.

                              Case No. 25-CR-211-JFH-2

TOMMY MCCARY,

        Defendant.

## OPINION AND ORDER

Before the Court is the Report and Recommendation of Magistrate Judge Gerald L. Jackson, which recommends denying Defendant Tommy McCary's Motion to Suppress. Dkt. Nos. 211, 274. McCary timely objected to the Report and Recommendation, to which the Government responded. Dkt. Nos. 305, 318. As set forth below, McCary's Objection to the Magistrate Judge's analysis is sustained in part and denied in part. The Court adopts the Report and Recommendation, albeit on different grounds, and, accordingly, McCary's Motion to Suppress is DENIED.

## BACKGROUND[1]

McCary is charged with one count of drug conspiracy in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A), and 841(b)(1)(C). Dkt. No. 2. Pursuant to a federal arrest warrant for that charge, law enforcement arrested McCary at his residence in McCurtain County, Oklahoma, on October 20, 2025. The relevant circumstances of that arrest, including the officers' search of his home and seizure of several items, are detailed below.

---

[1] This summary is based on the transcript of the March 4, 2026, evidentiary hearing before the Magistrate Judge [Dkt. No. 319], testimony offered at the April 17, 2026, evidentiary hearing before the Court [Dkt. No. 325], and screenshots and body camera footage offered by both parties as exhibits in that April 17 hearing.

At approximately 6:00 AM on October 20, 2025, Drug Enforcement Administration ("DEA") Agent Willie Mosley and McCurtain County Sheriff Officer Brian Sears briefed law enforcement officers with the McCurtain County Sheriff's Office Special Emergency Response Team ("SERT") about their plan for arresting McCary at his home. In doing so, they told the team that McCary was a felon, known to have firearms, and was involved in a recent shooting.

SERT officers and Officer Sears arrived at McCary's residence shortly after 7:00 AM. Agent Mosely was not present at that time. At 7:09:35 AM, the officers breached the front door, entered the home, and found McCary near an open bedroom door in the back of the house at 7:09:56 AM. Upon pointing their rifles at him, McCary raised his hand in the air, took five or six steps down the hallway towards the officers, and was handcuffed in the hallway at 7:10:10 AM.

As they handcuffed him, one officer asked McCary whether anyone else was in the house. McCary replied that his girlfriend, Ms. Nation, was still inside. An officer asked if anyone else was in the house, and McCary said no. The officer then asked where Ms. Nation was. She immediately responded to the question at 7:10:19 AM from behind a bathroom door, mere feet away from McCary and the officers. After directing her to come out several times, officers breached the bathroom door at 7:10:39 AM. Two officers handcuffed her at 7:10:50 AM.

After officers handcuffed Ms. Nation, two other officers immediately turned their attention to the bedroom doorway where McCary had surrendered. They slowly approached the doorway, and, with guns drawn, entered the bedroom at 7:10:56 AM. They spent approximately thirteen seconds clearing the room. As they did so, they noted three firearms inside in plain view: (1) a pistol under a bench next to the bed, (2) a second pistol underneath a nightstand, and (3) a shotgun leaned against the wall. Although they did not audibly identify a cellphone, body camera footage showed a cellphone on the nightstand in that room. They exited the bedroom at 7:11:09.

2

Agent Mosely finally arrived at the house around 7:30 AM.  Upon questioning Ms. Nation, she told him that the cellphone on the nightstand in the bedroom at issue was McCary's.  Officers then returned to the bedroom and seized the phone and the firearms.  Ms. Nation also told Agent Mosely that McCary left some dope along the side of the pathway to his house.  Based on this information, officers later found a camouflage bag outside the gate to his property containing a crystal substance later confirmed to be methamphetamine.

McCary subsequently moved to suppress "any and all items collected from the house of Mr. McCary during the warrantless search of his property," although he later clarified he did *not* seek to suppress the camouflage bag.  Dkt. Nos. 211 at 1, 305 at 5.  After the Court referred his Motion for Report and Recommendation, Judge Jackson held an evidentiary hearing on March 4, 2026.  Dkt. No. 250. Judge Jackson then entered his Report and Recommendation on March 10, recommending that McCary's Motion to Suppress be denied.  Dkt. No. 274.  After McCary timely objected to the Report and Recommendation on March 23, the Court held another evidentiary hearing on April 17 to allow the parties to supplement the record.  Dkt. Nos. 320, 325.  Following that hearing, the record is now sufficient to resolve McCary's Motion.

## STANDARD OF REVIEW

A district judge may refer a defendant's motion to suppress to a magistrate judge for findings and recommendation on resolving the motion.  Fed. R. Crim. P. 59(b)(1).  After the magistrate judge conducts a hearing and enters his or her recommendation, either party may file specific, written objections to the magistrate judge's recommendation within fourteen days.  Fed. R. Crim. P. 59(b)(2).  Failure to object waives a party's right to review.  *Id.*  If a party does file specific, written objections within fourteen days, then the district judge must review those objections de novo.  Fed. R. Crim. P. 59(b)(3).

**AUTHORITY AND ANALYSIS**

In his Objection, McCary argues Judge Jackson erred in finding that the officers conducted a proper, protective search under *Maryland v. Buie*, 494 U.S. 325 (1990), which sets out two scenarios where such searches are lawful. Although the Court agrees with McCary that the search did not satisfy *Buie*'s second scenario, the search satisfied *Buie*'s first scenario. Therefore, the protective search was lawful, and his Motion to Suppress will be denied.

### A. Applicable Law

The Fourth Amendment provides in relevant part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. "A defendant seeking to suppress evidence based on a warrantless seizure of his property bears the burden of proving the same." *United States v. Shrum*, 908 F.3d 1219, 1229 (10th Cir. 2018). If the defendant meets his burden of establishing a warrantless seizure, the burden then shifts to the Government to establish an exception to the Fourth's Amendment's warrant requirement. *Id.*; see *also United States v. Sporleder*, 635 F.2d 809, 813 (10th Cir. 1980). Here, the Government concedes that it seized the cellphone and firearms in McCary's home without a search warrant. So, to admit those items, the Government must demonstrate an exception to the Fourth Amendment allowing the officers to search McCary's home and seize those items without a search warrant.

To satisfy its burden, the Government argues the items were lawfully seized because they were in plain view during a lawful protective sweep. Dkt. No. 318 at 1-3. True, "if police officers conducting a proper protective sweep of a dwelling come across evidence of criminal activity in plain view they may seize it, so long as that evidence is such that a reasonable police officer would conclude, based on experience and the circumstances, that the item is probably incriminating." *United States v. Flores*, 149 F.3d 1272, 1278 (10th Cir. 1998). However, "[a] 'protective sweep'

is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *United States v. Banks*, 884 F.3d 998, 1013 (10th Cir. 2018) (quoting *Maryland v. Buie*, 494 U.S. 325, 327 (1990).  Accordingly, it should last no longer than "necessary to dispel the reasonable suspicion of danger and . . . no longer than it takes to complete the arrest and depart the premises." *Id.*

Protective sweeps are proper in two scenarios.  *United States v. Bagley*, 877 F.3d 1151, 1153 (10th Cir. 2017) (citing *Buie*, 494 U.S. at 334).  The first scenario allows officers to look in "closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched."  *Id.*  The second scenario allows an officer to go beyond immediately adjoining areas and to "look elsewhere in the house upon specific, articulable facts supporting a reasonable belief that someone dangerous remains in the house."  *Id.*  But if the officer "ha[s] no way of knowing, one way or another," whether someone else remains in the house, then a subsequent protective sweep to answer that question is improper.  *Id.* at 1156 (citing *United States v. Nelson*, 868 F.3d 885, 889 (10th Cir. 2017)).  And, if the protective sweep is ultimately improper, then evidence obtained from that improper sweep must be suppressed.  *Id.*

**B. Contrary to the Magistrate Judge's finding, the protective sweep did not fall under *Buie*'s second scenario.**

The Government ultimately persuaded the Magistrate Judge that the officers' sweep of the bedroom fell under *Buie*'s second scenario. Dkt. No. 274 at 6.  In doing so, the Government emphasized that McCary told his arresting officers Ms. Nation was still in the house. Dkt. No. 240 at 5.  Combining this statement with the officers' pre-existing knowledge that McCary was a felon, known to have firearms, and involved in a recent shooting, the Government argued that the officers had specific, articulable facts that Ms. Nation's presence in the house was a threat.  *Id*.  Thus, according to the Government, the officers could lawfully sweep the house for her, swept the

house for her, and found the firearms and cellphone *during* that sweep. *Id.* The Magistrate Judge ultimately incorporated this reasoning in his Report and Recommendation. Dkt. No. 274 at 5-6.

However, Defendant objected to this reasoning, arguing that the record contradicted the Government's version of events. For example, the Government never presented the officers' bodycam footage to the Magistrate Judge at the March 4 hearing. Instead, the Government offered Agent Mosely to testify about his review of the footage. Agent Mosely then testified that the officers located the items *after* they had already found Ms. Nation, not *during* their search for her:

> Q:  And you said there was a woman found in that residence?
>
> A:  Yes, sir
>
> Q:  Was she located during this protective sweep?
>
> A:  She was located prior to the protective sweep.
>
> Q:  Okay. Was she arrested?
>
> A:  No, sir. She was just detained.
>
> Q:  Okay. Now what, if anything, was located during this protective sweep of the residence?
>
> A:  During the protective sweep three firearms were located within the master bedroom.

Dkt. No. 319 at 11: 11-21. Because the Government did not present the bodycam footage or the officers who first swept the room, the Court scheduled another evidentiary hearing for April 17, 2026, to clarify, among other issues, the timeline and scope of first sweep of the bedroom. Dkt. No. 320.

Only then did the Government submit portions of the officers' bodycam footage. This footage showed that:

- After entering his home and travelling down a hallway, officers found McCary standing outside of a bedroom in the back of the house at 7:09:56. McCary

raised his hands in the air, took five or six steps down the hallway towards the officers, and was handcuffed in that same hallway at 7:10:10 AM.

- As they handcuffed him, one officer asked McCary whether anyone else was in the house at 7:10:13 AM. McCary replied that his girlfriend, Ms. Nation, was still inside. The officer asked him if anyone else was in the house, and McCary said no.

- The officer then asked him where Ms. Nation was. In response to the officer's question, her voice can immediately be heard at 7:10:19 AM behind a bathroom door, mere feet away from the officers.

- The officers immediately turned around towards the bathroom door. After asking her to come out several times, officers breached the bathroom door at 7:10:39 AM. Two officers handcuffed her at 7:10:50 AM.

- After the officers detained her, two other officers turned their attention to the bedroom doorway where McCary surrendered. They slowly approached the doorway, and, with guns drawn, entered the bedroom at 7:10:56 AM.

- As they cleared the bedroom, three firearms were observed in plain view: (1) a pistol under a bench next to the bed, (2) a second pistol underneath a nightstand, and (3) a shotgun leaned against the wall near that same nightstand. They exited the bedroom at 7:11:09.

In other words, the footage aligned with Agent Mosely's testimony—the officers swept the bedroom *after* their colleagues had already detained Ms. Nation.

So, once they detained Ms. Nation, the officers "had no way of knowing, one way or another," whether anyone else remained in the house. *Bagley*, 877 F.3d at 1156. And as the Tenth Circuit has explained, "there could always be a dangerous person concealed within a structure. But that in itself cannot justify a protective sweep, unless such sweeps are simply to be permitted as a matter of course." *Nelson*, 868 F.3d at 889 (quoting *United States v. Carter*, 360 F.3d 1235, 1242-43 (10th Cir. 2004). Thus, "'[n]o information' cannot be an articulable basis for a sweep that requires information to justify it in the first place." *Id.* (quoting *United States v. Colbert*, 76 F.3d 773, 778 (6th Cir. 1996)). Because there were no specific, articulable facts that someone else remained in the house, the sweep of the bedroom did not fall under *Buie*'s second scenario.

7

Therefore, Defendant's Objection to the Magistrate Judge's application of *Buie*'s second prong is SUSTAINED. The Court will not adopt this portion of the Report and Recommendation.

**C. The subsequent sweep fell under *Buie*'s first scenario.**

That leaves *Buie*'s first scenario, which the Government did not address in its response to McCary's Motion to Suppress, in response to his Objections to the Report and Recommendation, or during oral argument at either hearing. Nevertheless, the Court can still analyze this scenario where the record is adequately developed. *See Bagley*, 877 F.3d at 1154 (citing *Nelson*, 868 F.3d at 891).

As a reminder, *Buie*'s first scenario allows officers to, "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Nelson*, 868 F.3d at 891 (quoting *Buie*, 494 U.S. at 334)). To determine whether a protective sweep was proper under this scenario, a court must examine (1) the defendant's place of arrest, (2) whether the place searched "immediately adjoined" the place of arrest, and (3) whether the search was "substantially contemporaneous" with the arrest. *See Bagley*, 877 F.3d at 1155.

Although "[t]he meaning of 'arrest' can vary based on context," a person is "arrested" for purposes of a protective sweep when he is handcuffed or physically secured by law enforcement. *Id.* (holding that defendant was "arrested" when he was handcuffed near the front door of his house, not when he surrendered to law enforcement near his bedroom door). Because the bodycam footage showed McCary being handcuffed in the hallway outside his bedroom, that was his "place of arrest" for purposes of the protective sweep.

Next, the Court must examine whether the bedroom "immediately adjoined" the place of arrest. The D.C. Circuit's opinion in *United States v. Thomas* is helpful for this question. 429 F.3d

282 (D.C. Cir. 2005). There, the defendant was arrested in a hallway fifteen feet from a bedroom that "could be immediately accessed from the hallway." *Id.* at 287. "Because the entrance to the bedroom was a straight shot down the hallway from the spot where [the defendant] was arrested," the court held "the bedroom was a place 'immediately adjoining the place of arrest from which an attack could be immediately launched.'" *Id.* at 287 (quoting *Buie*, 494 U.S. at 334). Thus, the officers could search the bedroom adjoining that hallway to ensure their safety. *Id.*[2]

Here, the bedroom connected directly to the hallway where McCary was handcuffed. Furthermore, the distance between the bedroom and the place of arrest was very short, as bodycam footage showed McCary taking just five or six steps from the doorway of the bedroom to the spot where officers handcuffed him in the hallway. Because the bedroom opened to the hallway and was close to the place of arrest, the bedroom "immediately adjoined" McCary's place of arrest.

Finally, the Court must examine whether the search was "substantially contemporaneous" to McCary's arrest. "[C]ourts have found that a search may be incident to an arrest in cases where the search and arrest were separated by times ranging from five to sixty minutes." *United States v. Torres-Castro*, 470 F.3d 992, 998 (10th Cir. 2006) (citations omitted). That timeframe was even shorter here. Indeed, just forty-six seconds passed from the time officers handcuffed McCary to when they entered the back bedroom. The officers then took another thirteen seconds to sweep the bedroom and exit. So, at most, one minute passed from McCary's arrest to the completion of the sweep in the bedroom. This one-minute timespan was certainly contemporaneous to his arrest.

---

[2] *See also United States v. Ford*, 56 F.3d 265, 270 (D.C. Cir. 1995) ("[B]ecause the arrest took place in the hallway, and the bedroom from which Ford emerged was immediately adjoining the hallway, [the agent] could legitimately look in the bedroom for potential attackers."); *United States v. Kirk Tang Yuk*, 885 F.3d 57, 79 (2d Cir. 2018) ("Because the entrance 'hallway' and the living room in the residence at issue formed a single, undivided space . . . . it is entirely fair to say that the master bedroom 'immediate[ly] adjoin[ed]' the room in which Parrilla was arrested.").

Because the record satisfies each of these questions, the Court finds that the officers' initial sweep of the back bedroom fell under *Buie*'s first scenario.

**D.  The firearms and cellphone will not be suppressed.**

Ultimately, "[a] plain view seizure of incriminating evidence is sustainable if (1) the item is indeed in plain view; (2) the police officer is lawfully located in a place from which the item can plainly be seen; (3) the officer has a lawful right of access to the item itself; and (4) it is immediately apparent that the seized item is incriminating on its face." *United States v. Corral*, 970 F.2d 719, 723 (10th Cir. 1992). Because the officers' sweep of the back bedroom was lawful under *Buie*, the officers were "lawfully located" in the bedroom when they first viewed the firearms and cellphone and had a "lawful right of access" to those items. Furthermore, Defendant does not object to the Report and Recommendation's conclusions that those items were in plain view and incriminating in nature. Nor does the Court find any error in the Magistrate Judge's analysis of those elements, and thus, adopts those portions of his Report and Recommendation. Therefore, the Court concludes that the officers lawfully seized the firearms and cellphone from McCary's home. So, McCary's Motion to Suppress is DENIED.

***

A few final notes. The Court has issued a number of orders in this case requiring the Government to provide specific evidence or argument to assist the Court's ruling on various matters. *See, e.g.*, Dkt. Nos. 223, 320. However, the Government has routinely failed to fully comply with these orders. In fact, to resolve the current motion, the Court specifically directed the Government to "present testimony from the officer(s) with firsthand, personal knowledge of who first observed the three firearms and cellphone at issue and the manner in which they were recovered." Dkt. No. 320 at 2. Instead of providing the officers who conducted the protective

10

sweep of the bedroom and who captured the relevant body camera footage, the Government provided their superior, Officer Sears.  But Officer Sears did not conduct this protective sweep.  Moreover, Officer Sears could not even tell the Court who did.  In the future, the Court expects the Government to carefully read its orders, and then, comply with those orders.

Furthermore, the Government continually represented to the Magistrate Judge and the Court that officers swept the bedroom *while searching* for Ms. Nation. Dkt. No. 240 at 5 ("Once inside, they learned that there was another person inside the residence.  Therefore, they did a protective sweep of the residence for officer safety.  While performing the protective sweep, officers observed the three firearms and cellular phone in plain view."); Dkt. No. 318 at 2 ("Only then did officers conduct a protective sweep . . . because the defendant's girlfriend had not been located . . . . [A]t the time the firearms and cell phone were viewed, the defendant's girlfriend had not yet been located.").  But, the body camera footage showed the officers searching the bedroom *after* they saw Ms. Nation be detained.  In other words, the body camera footage—which the Government did not provide to the Magistrate Judge or the Court until the Court ordered another hearing—clearly conflicted with the Government's account of the protective sweep. And, although the footage still supported the lawfulness of the protective sweep, it was lawful under a theory the Government never argued.  In the future, the Court expects the Government to carefully review the evidence at issue and tailor its arguments and representations appropriately and accurately.

***

## CONCLUSION

In summary, although McCary's Objection is SUSTAINED IN PART, the Court ultimately ADOPTS the Magistrate Judge's Report and Recommendation [Dkt. No. 274] on different grounds.  McCary's Motion to Suppress [Dkt. No. 211] is thus DENIED.

IT IS SO ORDERED this 24th day of April, 2026.

_____

JOHN F. HEIL, III
CHIEF UNITED STATES DISTRICT JUDGE